## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

UNITED STATES OF AMERICA,

              Plaintiff,

    v.

275 MILTON RAHN ROAD RINCON,
GEORGIA 31326,

              Defendant.

CIVIL ACTION NO.: 4:18-cv-299

## O R D E R

This is a civil forfeiture action in which the United States seeks to forfeit a 26-acre parcel of land located at 275 Milton Rahn Road, Rincon, Georgia 31326 (the "Defendant Property"). The United States contends the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) because it was purchased by Pablo Rangel-Rubio with proceeds from an unlawful scheme orchestrated by him to harbor and employ undocumented persons.  (Doc. 1.)  Claimant Boni Romero-Hernandez filed a claim asserting her interest in the Defendant Property, (doc. 7), and an Answer raising, among other things, the affirmative defense that the Defendant Property is not subject to forfeiture because she qualifies as an "innocent owner" of the Defendant Property under 18 U.S.C. § 983(d)(3), (doc. 8).  Presently before the Court is the United States' Motion for Summary Judgment, in which it argues it has proved by a preponderance of the evidence that the Defendant Property is subject to forfeiture and that Claimant is not an innocent owner of the Defendant Property.  (Doc. 28.)  For the reasons stated below, the Court **DENIES** the United States' Motion for Summary Judgment.  (<u>Id.</u>)

## BACKGROUND

### I.      Rangel-Rubio's Harboring Scheme, Purchase of the Defendant Property, and Subsequent Conveyance of the Defendant Property to his Wife, Ingrid Lopez Tello

This case arises from a decade-long unlawful scheme orchestrated by Pablo Rangel-Rubio and others to hire, employ, and harbor illegal aliens, which earned him over $3,500,000. (Doc. 32, p. 1.)  The scheme began in 2007 and ended in late November 2017.  (Doc. 1, p. 3.) On July 22, 2016, while the scheme was still underway, Rangel-Rubio purchased the Defendant Property for approximately $121,709.94, receiving a limited warranty deed and corrective limited warranty deed.  (Doc. 32, p. 1; doc. 1, p. 5; <u>see</u> doc. 31-1, pp. 1–2.)  On February 1, 2018, Rangel-Rubio executed a Deed of Gift conveying the Defendant Property to his wife, Ingrid Lopez Tello.  (Doc. 31-2, p. 1; doc. 31, pp. 2–3.)  The Deed of Gift purports to grant Ms. Tello "all of [Rangel-Rubio's] rights" to the Defendant Property "for and in consideration of the natural love and affection he has for [her], at and before the sealing and delivery of this instrument."  (Doc. 31-2, p. 1.)  On September 13, 2018, Rangel-Rubio executed a Corrective Quitclaim Deed "to correct the names of both parties to correspond with and as shown on their proof of identity and driver's license" so as to "fully evidence the intent of [Rangel-Rubio] to transfer the [Defendant Property] to [Ms. Tello]."  (Doc. 31-2, pp. 2–3.)

### II.     Claimant's Relationship with Ms. Tello and Purchase of the Defendant Property

In her affidavit, Claimant states that she met Ms. Tello in 2010 or 2011 at the Mi-Mundo Grocery Store, which Claimant owned at the time. (Doc. 31, p. 19.)  Ms. Tello told her that her husband, Rangel-Rubio, "owned a tree company."  (<u>Id.</u>)  However, Claimant states that she "had no relationship with [Rangel-Rubio]" and "never talked with him."  (<u>Id.</u> at p. 19 n.3.)  In 2016, while working at Mi-Mundo, Claimant spoke to Ms. Tello "about [six] times—just casual conversations about the family."  (<u>Id.</u> at p. 19.)  In the late summer of 2018, Claimant ran into

Ms. Tello at WalMart, at which point Ms. Tello informed her that she wanted to sell her property (i.e., the Defendant Property) and her mobile home.  (Id. at pp. 19–20.)  According to Claimant, Ms. Tello thought that Claimant's ex-mother-in-law might be interested, but Claimant told her that she herself was interested.  (Id. at p. 20.)  Approximately two weeks later, Ms. Tello drove Claimant around the Defendant Property and showed her the two mobile homes located thereon.  (Id.)  Ms. Tello told Claimant that she was looking to sell the Defendant Property and one of the mobile homes for $300,000.  (Id.)  A week later, Claimant called Ms. Tello to inform her that she was unable to get a bank loan because of her credit.  (Id.)  Ms. Tello responded, "okay, that's fine," but a week later, she called Claimant to tell her that "she was going to have to go back to Mexico because her husband was going to be deported" and she offered to finance the purchase herself.  (Id.)

On October 4, 2018, Claimant purchased the Defendant Property from Ms. Tello for $200,000.  (Id.; see doc. 8, p. 25 (listing "[c]ontract sales price" as $200,000).)  Ms. Tello conveyed the Defendant Property to Claimant by warranty deed (the "Warranty Deed").  (Doc. 28, p. 4; doc. 31, pp. 20–21; see doc. 8, pp. 10–11; doc. 31-3.)  The Warranty Deed states that Ms. Tello grants Claimant the Defendant Property "for and in consideration of the sum of [$10.00] and other good and valuable considerations in hand paid at and before the sealing and delivery of these presents, the receipt whereof is hereby acknowledged[.]"  (Doc. 31-3, p. 1.)  In return, Claimant signed a Promissory Note, whereby she agreed to pay Ms. Tello $197,000, with payments of $1,500 per month for a total of 83 months and a balloon payment of $92,951.72 due and payable on October 4, 2025.[1]  (Doc. 32, p. 3; see doc. 31, p. 21; see also doc. 31-4, pp. 1–2

---

[1]  In Claimant's affidavit, she states she signed two promissory notes: the aforementioned Promissory Note (for the purchase of the Defendant Property), and another promissory note given to Ms. Tello for the purchase of a mobile home (the "Mobile Home Note") which was secured by the mobile home and paid at $1,500 per month.  (Doc. 31, p. 20 n.4.)  The Mobile Home Note is not included in the record.  However,

(promissory note); id. at pp. 3–4 (amortization schedule); id. at p. 6 (balloon rider).)  According to Claimant's Response to the Government's Special Interrogatories, Claimant paid Ms. Tello $3,000 for October's payments on the Promissory Note and Mobile Home Note at the October 4, 2018, closing.  (Doc. 30, p. 4; see doc. 31, p. 22.)  Furthermore, to effectuate the purchase, Claimant paid $4,500 in closing costs and $4,200 in attorney's fees.  (Doc. 32, p. 7; doc. 28-4, p. 2.)  Additionally, as part of the sale, Claimant granted Ms. Tello a Deed to Secure Debt to secure her repayment and performance of the Promissory Note.  (Doc. 32, p. 3; see doc. 31-5.)  The Warranty Deed and Deed to Secure Debt are signed by Ms. Tello and Claimant, respectively, notarized, and indicate that they were recorded in the Clerk of Superior Court of Effingham County.[2]  (See doc. 31-3 (the Warranty Deed); doc. 31-5 (the Deed to Secure Debt).)

Claimant has lived on the Defendant Property with her three minor children and mother since October 2018.  (Doc. 28, p. 10.) According to her affidavit, Claimant has made payments totaling $4,500 to Ms. Tello.  (Doc. 28-4, p. 2; doc. 32, p. 7; see doc. 31, p. 22 (monthly payments of $1,500 in October, November, and December of 2018).)  Additionally, according to Claimant's affidavit, since January 2019, she "ha[s] been depositing the $1,500.00 per month

_____

according to Claimant, it provided that if Ms. Tello did not provide Claimant the title to the mobile home by January 15, 2019, then all payments that had been paid on the Mobile Home Note would be credited to the Promissory Note.  (See id. at p. 21 n.4.)  Indeed, the Promissory Note itself has a "set off" provision which allows Claimant to apply any payments made on the Mobile Home Note to the principal of the Promissory Note in the event Ms. Tello did not timely deliver title.  (Doc. 31-4, p. 2.)  Claimant states that Ms. Tello never delivered title to her.  (Doc. 31, p. 20 n.4.)

[2] The copies of the Warranty Deed and the Deed to Secure Debt that Claimant attached to her Answer are not executed.  (See doc. 8, pp. 10–11 (the Warranty Deed); id. at pp. 19–24 (the Deed to Secure Debt).)  However, Claimant attached signed and notarized versions of the Warranty Deed and Deed to Secure Debt to her Response to Defendant's Motion for Summary Judgment.  (See generally doc. 31-3 (the Warranty Deed); doc. 31-5 (the Deed to Secure Debt).)

into [her savings account]."[3]  (Doc. 31, p. 22.)  Claimant also states in her affidavit that she made

three $1,500 payments to Ms. Tello on the Mobile Home Note in 2018.  (Doc. 31, p. 22.)

### III.    Underlying Criminal Proceedings

On August 20, 2017, law enforcement executed a search warrant on the Defendant

Property in connection with a months-long criminal investigation by Homeland Security

Investigations that resulted in Rangel-Rubio's arrest for his alleged involvement in the murder of

Eluid Montoya.  (Doc. 1, p. 5; doc. 31, p. 2.)  According to the Verified Complaint, during the

execution of the search warrant, law enforcement encountered several undocumented persons

living in the trailers located on the Defendant Property.  (Doc 1, p. 5.)

On December 7, 2018, a federal grand jury sitting in the Southern District of Georgia

returned an eight-count indictment (the "Indictment") against Rangel-Rubio charging him with

conspiring to, *inter alia*, shield, harbor, and conceal illegal aliens in violation of 8 U.S.C. §

1324(a)(1)(A)(v)(I), launder money in violation of 18 U.S.C. § 1956(h), and engage in money

laundering transactions in violation of 18 U.S.C. § 1957(a).  (Doc. 1, p. 3; doc. 32, p. 2.)  The

Indictment contained a forfeiture allegation which declared the Defendant Property forfeitable as

real property involved in, or traceable to property obtained during, the commission of these

charged offenses.  (Doc. 28-2, pp. 32–33.)  The Indictment further stated that the United States

(the "Government") intended to forfeit the Defendant Property upon Rangel-Rubio's conviction

of these offenses.  (Id.; see doc. 1, p. 3; doc. 32, p. 2.)

---

[3]    Claimant attached as exhibits a bank statement from Marshland Credit Union summarizing the
transactions on her account from July of 2021, (doc. 31-6, pp. 1–6), and a statement from an "E-Savings"
account at First Chatham Bank summarizing the account activity from April through June 2021, (id. at pp.
7–10).  Neither of these statements reflect deposits of $1,500.  (See generally doc. 31-6.)  Indeed, the only
entry of $1,500 is a debit from the First Chatham bank account on June 3, 2021, described as "online xfer
to reward checking."  (Id. at p. 7.)

IV.      **The Present Civil Forfeiture Proceeding**

On December 14, 2018, the Government filed a Verified Complaint for Forfeiture *In Rem* in this Court seeking forfeiture of the Defendant Property.  (Doc. 1.)  The Verified Complaint alleges that "[t]he Defendant Property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A), because it constitutes real property involved in a transaction or attempted transaction in violation of 18 U.S.C. § 1956."  (Id. at p. 1).  Specifically, the Verified Complaint alleges that Rangel-Rubio purchased the Defendant Property "with illicit funds that were generated by [his] unlawful scheme."  (Id. at p. 5.)  Concerning Rangel-Rubio's scheme, the Verified Complaint alleges:

> Beginning in or about 2007, and continuing through on or about November 20, 2017, [Rangel-Rubio], aided and abetted by others, did knowingly and willfully combine, conspire, confederate and agree with each other and other persons, known and unknown, to commit an offense against the United States.  More specifically, the Defendant knowingly and in reckless disregard of the fact that aliens had come to, entered, and remained in the United States in violation of the law, did conceal, harbor, and shield said alien [sic] from detection for purposes of commercial advantage or private financial gain in violation of [8 U.S.C. § 1324(a)(1)(A)(iii)].

(Id. at p. 3.)  The Verified Complaint also alleges that, as part of the scheme, Rangel-Rubio "unlawfully provide[d] housing on the Defendant Property for illegal aliens who had come to, entered, and remained in the United States" illegally and "sometimes unlawfully withheld money" from the wages of the illegal aliens he employed "for his own personal gain."[4]  (Id. at pp. 4–5.)  Lastly, the Verified Complaint alleges that the Indictment "establishes probable cause"

---

[4]  The Verified Complaint alleges that Rangel-Rubio worked as a supervisor for Wolf Tree, a wholly owned subsidiary of The Davey Tree Expert Company.  (Doc. 1, p. 4.)  As a supervisor, Rangel-Rubio allegedly "was responsible for hiring employees, completing their new hire employment paperwork, completing timesheet paperwork, and submitting payroll information" for employees in Savannah, Georgia.  (Id.)  According to the Verified Complaint, Rangel-Rubio's conspiracy involved obtaining names and social security numbers for illegal aliens and using those names to falsely complete timesheet paperwork and obtain paychecks made out to their assumed identities.  (Id. at pp. 4–5.)

that Rangel-Rubio conspired to harbor illegal aliens and launder money in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I) and 18 U.S.C. § 1956(h), respectively.  (See id. at p. 3; see doc. 28-2, pp. 8, 17.)

Four days later, the Government filed a Notice of Forfeiture addressed to Claimant notifying her that the United States had filed the Verified Complaint and had initiated proceedings for the forfeiture of the Defendant Property.  (Doc. 3.)  The Government certified that on December 18, 2018, it served Claimant the Notice of Forfeiture by sending a copy to her via certified mail addressed to the Defendant Property.[5]  (Id. at p. 4.)

On January 18, 2019, Claimant filed a Claim asserting her interest in the Defendant Property pursuant to 18 U.S.C. § 983(a)(4)(A).  (Doc. 7.)  The Claim states that on October 4, 2018, Ms. Tello conveyed the Defendant Property to Claimant by warranty deed, that Claimant signed a promissory note for $197,000, and that Claimant granted Ms. Tello a deed to secure the repayment of that note.  (Id. at p. 2.)  The Claim further states, "Although a deed to secure debt is considered a conveyance, it does not convey to a grantee an absolute estate.  Therefore, [Claimant] retains possession and the right of redemption, which together comprise an equitable estate."  (Id. at pp. 2–3.)  On January 25, 2019, Claimant filed an Answer with Defenses (the "Answer") asserting the affirmative defense that the Defendant Property is not subject to forfeiture because she is an innocent owner under 18 U.S.C. § 983(3)(A).  (See doc. 8, pp. 1–2.)

On August 6, 2021, the Government filed the at-issue Motion for Summary Judgment, arguing that it has established by a preponderance of the evidence that the Defendant Property is

---

[5]  The Certificate of Service also indicates that a copy of the Notice of Forfeiture was sent to Ms. Tello at the same address.  (Doc. 3, p. 4.)  Ms. Tello filed an Answer claiming ownership in the Defendant Property and opposing forfeiture.  (Doc. 5.)  The Government moved to strike her claim.  (Doc. 20.) After she failed to respond to the Court's order for her to respond, (doc. 21), the Court terminated her from this case.  (Doc. 22.)  Thus, Claimant Romero-Hernandez is the only remaining claimant.

subject to forfeiture and that Claimant is not an innocent owner.  (Doc. 28.)  Claimant filed a Response asserting her innocent owner defense.  (Doc. 32.)  Claimant attached as an exhibit to the Response an affidavit describing her relationship (or lack thereof) with Ms. Tello and Rangel-Rubio, her purchase of the Defendant Property, and the payments she has made to Ms. Tello to date.  (Id. at pp. 18–23.)  The Government filed a notice of intent to file a reply to Claimant's Response but never did so.  (Doc. 33.)

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if it "might affect the outcome of the suit under the governing law."  FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law."  Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial.  See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the

pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 256–57.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee Cnty., 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)). However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis omitted).

## DISCUSSION

The Government argues that it is entitled to summary judgment because (1) it has established by a preponderance of the evidence that the Defendant Property is subject to forfeiture, and (2) Claimant is not an innocent owner. (Doc. 28, p. 2.) Claimant contends that the Defendant Property is not subject to forfeiture because she is an innocent owner. (See docs. 8, 31.) The Government generally argues that Claimant is not entitled to the innocent owner defense. (Doc. 28, pp. 7–11.)

I.     **The Government Has Not Met its Burden of Proving that the Defendant Property is "Subject to Forfeiture" under 18. U.S.C. § 981(a)(1)(A).**

  A.  **The Government seeks forfeiture under Section 981(a)(1)(A) based on an alleged money laundering transaction in violation of 18 U.S.C. § 1956.**

In a civil forfeiture action, the Government bears the burden of establishing, by a preponderance of the evidence, that a property is "subject to forfeiture."[6]  18 U.S.C. § 983(c)(1). To prove that property is "subject to forfeiture," the Government may use "evidence gathered after the filing of a complaint for forfeiture."  18 U.S.C. § 983(c)(2).  The Government contends that it has "established by a preponderance of the evidence that the Defendant Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A) as property that constitutes real property involved in a transaction in violation of 18 U.S.C. § 1956."  (Doc. 28, p. 2); see 18 U.S.C. § 981(a)(1)(A) ("Any property, real or personal, involved in a transaction . . . in violation of [18 U.S.C. § 1956]" is "subject to forfeiture").   Therefore, the Government must prove by a preponderance of the evidence that the Defendant Property was involved in a transaction which violated 18 U.S.C. § 1956.

Section 1956 is the federal statute criminalizing various forms of money laundering.  See 18 U.S.C. § 1956.  The Government has not clearly articulated how the Defendant Property was involved in a money laundering transaction, or, more precisely, which provision of Section 1956 Rangel-Rubio violated such that the Defendant Property is subject to forfeiture under Section 981(a)(1)(A).  However, it appears from the allegations in the Verified Complaint that the

---

[6]  The Government has incorrectly argued that a probable cause standard applies.  (See doc. 28, p. 7 ("In bringing the action in forfeiture, the Government bears the burden of coming forward with evidence that it had probable cause to seize the property.  Once the government satisfies its burden, the burden of proof shifts to the Claimant to show, by a preponderance of the evidence, that the property is not subject to forfeiture.") (internal citations omitted).)  The Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") "alter[ed] the burdens borne by the parties to a civil forfeiture proceeding."  United States v.  Real Prop. Identified as: Parcel 03179-005R, 287 F. Supp. 2d 45, 62 n.17 (D.D.C. 2003).  "Previously, 'once the government made a showing of probable cause, the burden shifted to the claimant to prove by a higher standard of evidence—preponderance of the evidence—that forfeiture [was] not required.'"  Id. (quoting Real Property in Section 9, 241 F.3d 796, 797 (6th Cir. 2001)).  "Due to 'widespread criticism of this regime . . . Congress enacted CAFRA . . . [which] transferred the burden of proof from the claimant to the government and required the government to establish forfeiture by a preponderance of the evidence rather than by the lower probable cause standard[.]"  Id. (quoting United States v. $80,180.00 in U.S. Currency, 303 F.3d 1182,1184 (9th Cir. 2002)).

Government's position is that the Defendant Property is subject to forfeiture because Rangel-Rubio purchased it with proceeds from his harboring scheme.   (See doc. 1, p. 5 (alleging that Rangel-Rubio purchased the Defendant Property with "illicit funds that were generated by [his] unlawful scheme" to harbor and employ persons who entered the United States illegally); see id. at pp. 3–4 (alleging that Rangel-Rubio's scheme consisted of concealing, harboring, and shielding from detection undocumented persons in violation of Section 1324(a)(1)(A)(iii), which prohibits harboring undocumented persons).)   Section 1956(a)(1)(A) makes it unlawful to purchase real property with proceeds generated from harboring undocumented persons in violation of 8 U.S.C. § 1324(a)(1)(A)(iii).[7]   See 18 U.S.C. § 1956(a)(1)(A).   Accordingly, the Government may establish that the Defendant Property was involved in a transaction in violation of U.S.C. § 1956(a)(1)(A)—and therefore "subject to forfeiture for purposes of 18 U.S.C. § 981(a)—by proving by a preponderance of the evidence that Rangel-Rubio purchased the Defendant Property with proceeds generated from harboring undocumented persons.   United

---

[7] To be clear, Section 1956(a)(1)(A) does not explicitly proscribe the purchase of property with proceeds from harboring undocumented persons. Rather, it does so by virtue of a statutory chain.   Section 1956(a)(1)(A) generally prohibits a person from conducting a "financial transaction" with proceeds from any of the enumerated forms of "specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A).   The term "financial transaction" includes the purchase of real property "which in any way or degree affects interstate or foreign commerce."   See 18 U.S.C. § 1956(c)(4)(A)(iii); see also 18 U.S.C. § 1956(c)(3) (defining "transaction" to include a "purchase").   Additionally, the definition of "specified unlawful activity," which is set forth in Section 1956(c)(7), includes, in relevant part, "any act or activity constituting an offense listed in [S]ection 1961(1)."   18 U.S.C. § 1956(c)(7)(A).   Section 1961(1) provides the definition of "racketeering activity" for purposes of 18 U.S.C. § 1961, et seq.   See 18 U.S.C. § 1961(1).   "[R]acketeering activity" includes "any act which is indictable under" Section 274 of the Immigration and Nationality Act ("INA").   18 U.S.C § 1961(1)(F).   Section 274 of the INA, which is codified at 8 U.S.C. § 1324, makes it unlawful for any person, with knowledge or reckless disregard for the fact that a person entered the United States illegally, to "conceal[], harbor[], or shield[]" that person from detection.   8 U.S.C. § 1324(a)(1)(A)(iii).   Thus, harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii)—which is the statute the Government alleges Rangel-Rubio's illicit scheme violated, (doc. 1, pp. 3–4)—is a "specified unlawful activity" for purposes of Section 1956(a)(1)(A).   Therefore, a violation of Section 1956(a)(1)(A) occurs when a person purchases property with proceeds from harboring illegal aliens, provided the person did so with knowledge that the proceeds came from some form of unlawful activity and with the intent to promote his or her harboring activities or some other unlawful conduct.   See 18 U.S.C. § 1956(a)(1)(A)(i) (incorporating a knowledge and intent element).

States v. One Hundred Thirty-Eight Thousand One Hundred Eighty-Six Dollars & Twenty-Eight Cents, 520 F. Supp. 2d 1072, 1079 (N.D. Iowa 2007) (stating that, "the substantive law clearly directs . . . the question of whether the defendant property is traceable to [the underlying unlawful transaction]," and therefore is "subject to forfeiture" under 18 U.S.C. § 981(a)(1)(A)).

To prove a defendant committed money laundering under 18 U.S.C. § 1956(a)(1)(A)(i), the Government must show that the defendant "engaged in financial transactions with the knowing use of the proceeds of illegal activities and with the intent to promote the carrying on of unlawful activity." United States v. Hudspeth, 525 F.3d 667, 679 (8th Cir. 2008) (internal quotations omitted); see also United States v. Warshak, 631 F.3d 266, 317 (6th Cir. 2010). More precisely, the Government must prove that the person (1) conducted a financial transaction (such as purchasing property) with the proceeds of "specified unlawful activity" (2) with the knowledge that the proceeds came from "some form of unlawful activity" and (3) with the intent "to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i); see 18 U.S.C. § 1956(c)(4)(A)(iii); see also 18 U.S.C. § 1956(c)(3) (defining "transaction" to include a "purchase"). In this case, the "specified unlawful activity" at issue is Rangel-Rubio's illicit scheme to harbor and conceal undocumented persons. See note 7, supra (indicating that harboring in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) is a "specified unlawful activity" for purposes of Section 1956(a)(1)(A)); (see also doc. 1, pp. 3–6.) Thus, in order for the Government to prove Rangel-Rubio purchased the Defendant Property under Section 1956(a)(1)(A), it would have to prove that he (1) purchased the Defendant Property using proceeds generated from his harboring scheme (2) with knowledge that the proceeds came from some form of illegal activity and (3) with the intent to promote the carrying on of his harboring scheme or some other "specified unlawful activity."

**B.** **There is a genuine issue of material fact as to whether the Defendant Property was involved in a transaction which violated 18 U.S.C. § 1956(a)(1)(A).**

The Court finds that summary judgment is inappropriate because there is a genuine issue of material fact as to whether the Defendant Property is subject to forfeiture under Section 981(a)(1)(A). Specifically, on this record, the Court cannot conclude as a matter of law that the Defendant Property is traceable to a transaction that violated Section 1956(a)(1)(A) because there is no relevant evidence suggesting that Rangel-Rubio purchased the Defendant Property with proceeds generated from his harboring scheme.

It is undisputed that Rangel-Rubio purchased the Defendant Property and that he engaged in an illicit scheme to harbor and employ undocumented persons. Indeed, Claimant concedes that, "[o]n or about July 21, 2016, *during the time of the commission of the [harboring scheme]*, [Rangel-Rubio] purchased the Defendant Property for approximately $121,709.94." (Doc. 32, p. 1 (emphasis added).) Additionally, Claimant submitted copies of the limited warranty deed Rangel-Rubin received for the Defendant Property on July 22, 2016, (doc. 31-1), the Deed of Gift transferring the Defendant Property to Ms. Tello, (doc. 31-2), and the subsequent Corrective Quitclaim Deed clarifying his intent to do so, (doc. 31-3). Crucially, however, there is, at best, wholly circumstantial evidence tying the proceeds from Rangel-Rubio's harboring scheme to the Defendant Property. The Government argues that the Defendant Property is traceable to the proceeds of Rangel-Rubin's harboring scheme because he "obtained over $3,500,000 from his unlawful scheme to hire and employ undocumented people" and purchased the Defendant Property while the scheme was ongoing. (See doc. 28, pp. 10–11; doc. 32, p. 1.) The Government also alleges that Rangel-Rubio "sometimes . . . withheld money" from his undocumented employees' wages "for his own personal gain." (Doc. 1, p. 5.)

With only these facts before it, a reasonable jury could reject the Government's theory and find that the Defendant Property was purchased with proceeds from lawful sources rather than his harboring activities.  See One Hundred Thirty-Eight Thousand One Hundred Eighty-Six Dollars & Twenty-Eight Cents, 520 F. Supp. 2d at 1079 ("Without any evidence to show that the defendant property is traceable to the interstate transportation of stolen property, the court has no doubt in concluding a reasonably jury could return a verdict for the nonmoving party on the question. Thus, a genuine issue of material fact remains, and summary judgment must be denied.") (internal citations and quotations omitted) (citing Anderson, 477 U.S. at 248).

Moreover, even if the Government had conclusively established that the Defendant Property was purchased with unlawful proceeds, there is a genuine issue of material fact as to whether Rangel-Rubio purchased the Defendant Property with the intent to "promote the carrying on" of his scheme or some other "specified unlawful activity."   18 U.S.C. § 1596(a)(1)(A)(i); see Warshak, 631 F.3d at 317 ("To prove a defendant guilty [under Section 1956(a)(1)(A)], the government must demonstrate that he . . . intended to promote th[e] unlawful activity.") (internal citations omitted).   The Verified Complaint alleges that Rangel-Rubio "unlawfully provided housing on the Defendant Property for illegal aliens" and that, when law enforcement executed a search warrant on the Defendant Property in 2017, they encountered several undocumented aliens in the trailers located on the Defendant Property.  (Doc. 1, pp. 4–5.) However, the Government does not provide any evidence—or even allege—that Rangel-Rubio purchased the Defendant Property so that he could provide housing to undocumented persons or for any other unlawful purpose.  (See generally docs 1, 28.)  To the contrary, the Government alleged in the Verified Complaint that Rangel-Rubio lived on the Defendant Property with his family.  (Doc. 1, p. 5.)  Thus, on this record, a reasonably jury could conclude that Rangel-Rubio

purchased the Defendant Property simply to provide a home for his family or for some other lawful purpose.

Based on the forgoing, the Court cannot conclude as a matter of law that the Defendant Property was involved in a money laundering transaction because there is a genuine dispute of material fact as to whether Rangel-Rubio's purchase of the Defendant Property satisfied necessary elements to convict under Section 1956(a)(1)(A). As such, a reasonable jury could find that the Defendant Property is not "subject to forfeiture" under Section 981(a)(1)(A). Therefore, the Government's Motion for Summary Judgment on this issue must be denied. (Doc. 28.)

## II.   There is a Genuine Dispute of Fact as to Whether Claimant is Entitled to the "Innocent Owner" Defense from 18 U.S.C. § 983(d).

In Claimant's Answer, she asserts the defense that she is an innocent owner under Section 983(d). (See doc. 8, pp. 1–2.) The Government argues that it is entitled to summary judgment on Claimant's innocent owner defense because she cannot prove the necessary elements. (See doc. 28, pp. 2, 7–11.) Specifically, the Government contends that Claimant has failed to prove that she is a "bona fide purchaser" and cannot satisfy the four-part test from Section 983(d)(3)(B) that, according to the Government, "must be met" in order to successfully assert the innocent owner defense. (Id.)

Under the civil forfeiture statute, "[a]n innocent owner's interest in property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d)(1). A claimant bears the burden of proving by a preponderance of the evidence that he or she is an innocent owner.[8] Id. In cases

---

[8]  The civil forfeiture statute defines an "owner" as "a person with an ownership interest in the specific property sought to be forfeited, including a leasehold, lien, mortgage, recorded security interest, or valid assignment of an ownership interest." 18 U.S.C. § 983(d)(6)(A). In their briefing, the parties do not dispute the issue of whether Claimant qualifies as an owner. (See generally docs. 28, 31; see also doc. 31-3.)

like this one, where the "property interest [was] acquired after the conduct giving rise to the forfeiture has taken place," the person claiming to be an "innocent owner" must show that, at the time that person "acquired the interest in the property[,] . . . [the person] was a bona fide purchaser . . . for value (including a purchaser . . . of goods or services for value); and . . . did not know and was reasonably without cause to believe that the property was subject to forfeiture." 18 U.S.C. § 983(d)(3)(A).[9]  See United States v. Assets Described in Attachment A to the Verified Complaint Forfeiture In Rem, 799 F. Supp. 2d 1319, 1330 (M.D. Fla. 2011) ("In order to establish an innocent owner defense under Section 983(d)(3)(A), for a property interest arising after the conduct giving rise to forfeiture occurred, a claimant must demonstrate by a preponderance of the evidence that it was a bona fide purchaser or seller for value and did not know or was reasonably without cause to believe the property at issue was subject to forfeiture.").

### A.    Claimant's Status as a "Bona Fide Purchaser for Value"

Claimant argues that she is a bona fide purchaser for value because she bought the Defendant property for $200,000.00, signed a Promissory Note for $197,000.00, and did not have notice of prior adverse claims.  (Doc. 31, p. 9.)  "The civil-forfeiture statute, 18 U.S.C. § 983, does not provide a definition of 'bona fide purchaser for value,' so courts have borrowed the definition from the Continuing Criminal Enterprise Act, 21 U.S.C. § 853(n)(6)(B)."  United States v. Real Prop., Including All Improvements Thereon & Appurtenances Thereto, Located at 246 Main St., Dansville, Livingston Cnty., New York, 118 F. Supp. 3d 1310, 1322–23 (M.D.

---

[9]  In this case, the parties agree that Claimant acquired her interest in the Defendant Property after Rangel-Rubio's illegal harboring scheme had ended and that, therefore, Section 983(d)(3)(A) applies. (See doc. 28, pp. 7–11; see doc. 31, pp. 8–9.)

Fla. 2015)[10] (quoting United States v. Contents of Smith Barney Citigroup Acct. No. 34–19, 482 F. App'x. 134, 137 n.2 (6th Cir. 2012)); see also United States v. Hooper, 229 F.3d 818, 823 (9th Cir. 2000) (recognizing that CAFRA eliminated any distinction between bona fide purchaser status in criminal and civil forfeiture cases)).  In the criminal forfeiture context, courts liberally construe the term "bona fide purchaser for value" to include "all persons who give value . . . in an arms'-length transaction with the expectation that they would receive equivalent value in return."  246 Main St., 118 F. Supp. 3d at 1323 (quoting United States v. Cox, 575 F.3d 352, 356 (4th Cir. 2009)); see 21 U.S.C. § 853(n)(6)(b).[11]

The Government does not argue that Claimant failed to give value for the Defendant Property nor does it contend that the purchase was not transacted at arm's length.  (See generally doc. 28.)  Instead, the Government argues that because "the documents [Claimant] provided to substantiate her interest were unexecuted, . . . it is arguable that [] Claimant and Ms. Tello never entered into an enforceable contract, and thus [] Claimant never acquired any legal interest in the Defendant Property."  (See id. at pp. 7–9.)  While the Government is correct that the Warranty Deed and the Deed to Secure Debt that Claimant attached to her Answer were not executed, (see doc. 8, pp. 10–11 (the Warranty Deed); id. at pp. 19–24 (the Deed to Secure Debt)), Claimant attached signed and notarized versions of both documents to her Response to Defendant's Motion for Summary Judgment, (see generally doc. 31-3 (the Warranty Deed); doc. 31-5 (the Deed to Secure Debt)).  See note 2, supra.  Thus, the Government's contention that Claimant

---

[10]  Henceforth in this Order, the Court will cite to this case using the following short form: 246 Main St..

[11]  CAFRA's legislative history also suggests that the term "bona fide purchaser" should be interpreted broadly.  See also United States v. One 1990 Beechcraft, 1900 C Twin Engine Turbo–Prop Aircraft, Venezuelan Registration No. YV219T, Serial UC118, 619 F.3d 1275, 1277 (11th Cir.2010) ("In its Report [concerning CAFRA], the House Judiciary Committee emphasized the need for a strong statutory innocent owner defense . . . ."); see also H.R. Rep. No. 106–192, at 8 (1999) (indicating that the Judiciary Committee was "gravely concerned" about individuals having to "overcome tremendous procedural hurdles" to "prove their property was 'innocent'").

does not possess a legal interest in the Defendant Property because the Promissory Note and/or the Warranty Deed are unexecuted is not supported by the record.

Next, the Government argues that, to the extent Claimant has any legal interest in the Defendant Property, her interest would be reasonably limited to the amount she has paid towards the sales price. (Doc. 28, pp. 8–9.) For support, the Government relies on United States v. McCorkle, 321 F.3d 1292 (11th Cir. 2003). (Id. at p. 8.) This reliance is misplaced. McCorkle does not establish that a claimant qualifies as a bona fide purchaser only up to the value that he or she has paid towards the property.[12] Rather, McCorkle merely clarifies that, in the criminal forfeiture context, "the only assets that are potentially immunized from forfeiture are those for which value has been given." 321 F.3d at 1295 n.4 (interpreting 21 U.S.C. § 582(n)(6)(B)). As indicated above, the Government does not dispute that value was given by Claimant in exchange for the Defendant Property. According to the Government's own calculation, Claimant has paid "approximately $13,200 to effectuate the purchase of the Defendant Property." (Doc. 28, p. 8.)) Thus, even under the standard stated in the footnote in McCorkle, the Defendant Property is an "asset[] that [is] potentially immunized from forfeiture," 321 F.3d at 1295 n.4; the fact that Claimant has paid only a relatively small portion of the sales price does not preclude her from qualifying as a bona fide purchaser for value of the Defendant Property.

---

[12] Indeed, McCorkle did not involve a situation where fewer-than-all payments had been given in exchange for real or personal property, but instead, in that case the Eleventh Circuit Court of Appeals addressed (in dicta, in a footnote) whether "[a] criminal defendant [can] pay an attorney for the rendition of future legal services with the expectation that the entire payment will be immune from forfeiture." 321 F.3d at 1295 n.4. The Court of Appeals answered that question in the negative, explaining that, in that specific context, "the court would have to pro rate the value of services that have been rendered by the attorney, immunizing from forfeiture only those fees earned while meeting the [bona fide purchaser] test." Id. Here, the Government seeks to extrapolate from that comment that this Court is required to somehow pro rate the Defendant Property based on the amount of the total purchase price that has been paid by Claimant, immunizing from forfeiture only some percentage interest in the Defendant Property. Without more than this dicta in a footnote from a case involving the forfeiture of cash paid in exchange for future legal work (as opposed to real property transferred for a purchase price), the Court declines to further entertain this argument.

In sum, because a reasonable juror could conclude that Claimant is a bona fide purchaser for value, the Court declines to grant summary judgment in the Government's favor on this basis.

**B.      Whether Claimant Did Not Know, and Was Reasonably Without Cause to Believe, the Defendant Property Was Subject to Forfeiture**

In addition to qualifying as a bona fide purchaser for value, Section 983(d)(3)(A) requires a claimant asserting the innocent owner defense to show that he or she "did not know and was reasonably without cause to believe that the property was subject to forfeiture."  18 U.S.C. § 983(d)(3)(A)(ii).  To meet this burden, a claimant must "establish that he was ignorant of the fact that the [property sought to be forfeited] was involved in, traceable to, or derived from proceeds traceable to a criminal violation." <u>246 Main St.</u>, 118 F. Supp. 3d at 1329 (citing <u>United States v. An Int. in the Real Prop. Located at 2101 Lincoln Blvd., Los Angeles, Cal.</u>, 729 F. Supp. 2d 1150, 1154 (C.D. Cal. 2010) (clarifying that, for purposes of civil forfeiture cases brought under Section 981(a)(1)(A), "the purported innocent owner [need not] be ignorant of the forfeiture laws; rather, . . . the innocent owner [must] be ignorant of *the fact that the property was involved in or traceable to a criminal violation*.")).   Thus, in this case, Claimant must prove by a preponderance of the evidence that she did not know, nor reasonably should have known, that the Defendant Property was purchased with proceeds generated from Rangel-Rubio's harboring scheme or that the Defendant Property is traceable to some other transaction in violation of Section 1956.  <u>See</u> Discussion Section I.A., <u>supra</u> (discussing the "subject to forfeiture" requirement under Section 981(a)(1)(A) in the context of this case).

As discussed in Discussion Section I.B., <u>supra</u>, there is a genuine dispute of fact as to whether the Defendant Property is subject to forfeiture because a reasonable juror could conclude that it was not purchased with funds generated from Rangel-Rubio's harboring scheme. <u>See</u> Discussion Section I.B., <u>supra</u>.  However, even if the Court found that the Defendant

Property was subject to forfeiture as a matter of law, the Government has failed to argue, much less present any evidence suggesting, that Claimant knew or reasonably had cause to believe that the Defendant Property was subject to forfeiture.  (See generally doc. 28.)  Indeed, there is no evidence that Claimant had any idea that Rangel-Rubio was involved in an illicit harboring scheme or any other illicit or illegal activity, much less that he purchased the Defendant Property with the proceeds therefrom.  According to Claimant's affidavit, she first learned about the Defendant Property in 2018, when she ran into Ms. Tello at WalMart, and Ms. Tello told her that she was looking to sell "*her* mobile home/ property."  (Doc. 31, p. 20 (emphasis added).)  The only evidence which reasonably could have put Claimant on notice that Rangel-Rubio previously owned the Defendant Property is the Warranty Deed, which states that the Defendant Property is the "same property conveyed by [Rangel-Rubio] to [Ms. Tello] as evidenced by [the] Corrective Quitclaim Deed."  (Doc. 31-3, p. 1; see generally doc. 31-2.)  However, the Warranty Deed does not indicate whether Rangel-Rubio had purchased the Defendant Property or had received it as a gift.  (See generally doc. 31-1.)  Indeed, nothing in the record indicates that Claimant knew or should have known any details concerning Rangel-Rubio's acquisition of the Defendant Property, such as his funding source.  To the contrary, Claimant reasonably could have thought that Rangel-Rubio acquired the Defendant Property through proceeds generated from operating the tree company Ms. Tello told Claimant he owned.  (See doc. 31, p. 19 n.3.)  Additionally, none of Claimant's interactions or communications with Ms. Tello prior to the sale of the Defendant Property indicate that Claimant was or should have been aware that it was purchased with funds traceable to any unlawful activity.  Claimant's affidavit states that in 2016 she spoke with Ms. Tello "about 6 times—just casual conversations about the family."  (Id. at p. 19.) However, there is no evidence that she and Ms. Tello discussed the Defendant Property during

those conversations.  Furthermore, although Ms. Tello later told Claimant that "she was going to have to go back to Mexico because her husband was going to be deported," nothing in the record suggests that Ms. Tello told her *why* he was being deported, or that his deportation was related in any way to a criminal enterprise, much less to the Defendant Property.  (Id. at p. 20.)  Finally, there is no evidence that, when Ms. Tello drove Claimant around the Defendant Property and showed her the two mobile homes thereon, Claimant saw any undocumented persons or anything else that should have alerted her to any illicit activity on the Property. (See generally id.; see also doc. 30, p. 4.)  Thus, because a reasonable juror, on this record, could conclude that Claimant did not know nor reasonably should have known that the Defendant Property was purchased with funds traceable to Rangel-Rubio's harboring scheme or any other transaction in violation of Section 1956, the Court declines to grant summary judgment in the Government's favor on this issue.  See, e.g., 246 Main St., 118 F. Supp. 3d at 1329–30 ("Stern has established that he did not know and was reasonably without cause to believe that the [Health Street Property] was subject to forfeiture, and the United States has failed to create a factual dispute on this point. . . .  [T]he United States cites no facts to establish or even suggest that Stern knew—or even had reasonable cause to know—that *the property* was subject to forfeiture.  In fact, the Government does not even argue that Stern had reasonable cause to believe that the Health Street Property was subject to forfeiture when he acquired title to it.") (internal quotations and citations omitted).

C.   **The Government is Not Entitled to Summary Judgment as to the Availability of the Exception Provided by Section 983(d)(3)(B).**

The Government inaccurately argues that "Section 983(d)(3)(B) contains a four-part test that must be met in order for a Claimant to be successful in raising an innocent owner defense," and it then proceeds to argue that Claimant cannot show, as required by the third part of the test, that "the property . . . is not traceable to[] the proceeds of any criminal offense," 18 U.S.C. §

983(d)(3)(B)(iii).  (See doc. 28, pp. 9–11.)  Section 983(d)(3)(B) does not establish a mandatory

test that a claimant must satisfy to qualify as an innocent owner.  Rather, it is an exception giving

grounds for a claimant who uses the property sought to be forfeited as their primary residence to

assert the innocent owner defense *even though* he or she is not a bona fide purchaser for value.

See 18 U.S.C. § 983(d)(3)(B); see United States v. Real Prop. Located & Situated at 404 W.

Milton St., Austin, Travis Cnty., Tex., No. A-13-CA-194-SS, 2014 WL 5808347, at *8 (W.D.

Tex. Nov. 7, 2014) ("The [Section] 983(d)(3)(B) primary residence exception  . . . prevents 'an

otherwise valid claim' under [Section] 983(d)(3)(A) from being denied on grounds the claimant

gave no value in exchange for the property[.]").  Assuming this exception is or otherwise could

become applicable in this case (i.e., in the event a jury finds that Claimant was not a bona fide

purchaser for value), the Government is not entitled to summary judgment regarding the

applicability of the exception on the proffered ground, because, as explained in Discussion

Section I.B, supra, a reasonable jury could find that the property is not traceable to the proceeds

of Rangel-Rubio's criminal offense.

   In sum, based on the forgoing, the Court finds that a reasonable jury could conclude that

Claimant is an innocent owner under Section 983(d)(3)(A) because there is sufficient evidence to

find that she is a bona fide purchaser for value, and the Court also finds that the Government has

not proven it is entitled to summary judgment on the availability of the innocent owner exception

provided under Section 983(d)(3)(B).  Accordingly, the Government's request for summary

judgment on the innocent owner issue must be denied.

## CONCLUSION

Based on the forgoing, the Court **DENIES** Plaintiff United States' Motion for Summary Judgment.  (Doc. 28.)

**SO ORDERED** this 30th day of March, 2022.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA